**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
————————————————————————————————

**V.M., individually and on behalf of**
**G.M., a child with a disability,**

                                    **Plaintiff,**              **1:11-cv-1335**
         **v.**                                                **(MAD/ CFH)**

**NORTH COLONIE CENTRAL SCHOOL DISTRICT,**

                                    **Defendant.**
————————————————————————————————

**APPEARANCES:**                    **OF COUNSEL:**

**OFFICE OF ANDREW K. CUDDY**        **JASON H. STERNE, ESQ.**
5888 Main Street
Williamsville, New York 14221
Attorneys for Plaintiff

**YOUNG, SOMMER LAW FIRM**          **KENNETH S. RITZENBERG, ESQ.**
Executive Woods
Five Palisades Drive
Albany, New York 12205
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On November 20, 2011, Plaintiff commenced this action for review of an August 22, 2011

administrative order issued by the New York State Education Department's Office of State

Review.  The administrative order sustained, in part, the decision and order of an impartial

hearing officer ("IHO") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401

*et seq.* ("IDEA") and Article 89 of the Education Law of the State of New York.  *See* Dkt. No. 1.

Defendant moves for summary judgment as to all of Plaintiff's claims, pursuant to Federal Rule of

Civil Procedure 56.  *See* Dkt. Nos. 9-11.  Plaintiff opposes and cross moves for summary

judgment.  *See* Dkt. No. 13.

# II. BACKGROUND[1]

Plaintiff V.M. brings this action on behalf of her daughter, G.M., who was diagnosed with Down Syndrome at birth.  *See* Dkt. No. 9 at ¶ 1.  G.M. has been a student in the North Colonie School District since 2002, when she entered kindergarten.  *See id.* at ¶ 7.  Plaintiff filed a due process hearing request, alleging that Defendant violated the IDEA by failing to provide G.M. with a free appropriate public education ("FAPE") for the 2008-2009, 2009-2010, and 2010-2011 school years.  *See* Dkt. No. 13-3 at 4.[2]  After a hearing, the IHO determined that Defendant provided G.M. with a FAPE in 2008-2009 and 2009-2010, but denied her a FAPE in 2010-2011. *See* Dkt. No. 10-4 at 13.  Defendant appealed to the State Review Officer ("SRO"), who concluded that the IHO was correct in denying the claims with respect to 2008-2009 and 2009-2010; however, the SRO dismissed Plaintiff's claims for the 2010-2011 school year as moot.  *See* Dkt. No. 10-5.  The SRO also found that Plaintiff was precluded from alleging that G.M. was denied a FAPE with respect for all three school years because Plaintiff withheld consent for Defendant to conduct updated evaluations recommended by law.  *See id.*

A.    **IDEA**

The IDEA is part of "an ambitious federal effort to promote the education of handicapped children."  *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179

---

[1] Unless otherwise noted, the facts contained in the "Background" section of this Memorandum-Decision and Order are undisputed.

[2] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

(1982).  To accomplish this goal, Congress provides federal funds to those states that develop

plans to assure that all children with disabilities have the right to a "free appropriate public

education."  20 U.S.C. § 1412(1); *see also Rowley*, 458 U.S. at 181.  The FAPE mandated by

federal law must include special education and the necessary related services that are tailored to

meet the unique needs of each particular student, and be "reasonably calculated to enable the

child to receive educational benefits."  *Rowley*, 458 U.S. at 207.  "The 'centerpiece' of the IDEA's

education delivery system is the 'individualized education program,' or 'IEP.'"  *Murphy v.

Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (quoting *Honig v. Doe*,

484 U.S. 305, 311, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)).

     A school district has met its obligation to provide a FAPE when (a) the district complies

with the procedural requirements of the IDEA, and (b) the IEP developed by the district is

reasonably calculated to enable the student to receive educational benefits.  *See id*. (citation

omitted).  The law expresses a strong preference for children with disabilities to be educated in an

integrated setting with their non-disabled peers, to the extent that integration is appropriate.  *See

Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation omitted).  To

that end, special education and related services must be provided in the "least restrictive

environment" ("LRE") that is consistent with a child's needs.  *See id*.  A child should be

segregated only "when the nature or severity" of a child's disability is such "that education in

regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

20 U.S.C. § 1412(5).

     Each year, a school official qualified in special education, the child's teacher, the child's

parents, and, where appropriate, the child, should participate in the development of an IEP.  *See*

20 U.S.C. § 1401(a)(20).  The IEP should articulate the particular needs of the disabled child as

well as the services required to meet those needs.  *See* 20 U.S.C. § 1414(a)(5).  Specifically, an

IEP must state (1) the child's present level of educational performance; (2) the annual goals for

the child, including short-term instructional objectives; (3) the specific educational services to be

provided to the child, and the extent to which the child will be able to participate in regular

educational programs; (4) the transition services needed for a child as he or she begins to leave a

school setting; (5) the projected initiation date and duration for proposed services; and (6)

objective criteria and evaluation procedures and schedules for determining, on at least an annual

basis, whether instructional objectives are being achieved.  *See* 20 U.S.C. § 1401(a)(20).

Parents who are dissatisfied with a proposed IEP may file a complaint with the state

educational agency.  *See* 20 U.S.C. § 1415(b)(1)(E).  Complaints are resolved through an

"impartial due process hearing," during which school officials have the burden of showing the

appropriateness of the proposed IEP.  *See* 20 U.S.C. § 1415(b)(2); N.Y. Educ. Law § 4404(1)(c);

*see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012).  A local hearing

officer's decision may be appealed to the state educational agency.  *See* 20 U.S.C. § 1415(c).

After this appeal, any party still aggrieved may bring suit in either state or federal court.  *See* 20

U.S.C. § 1415(e)(2).  A court will fashion appropriate relief based on its independent assessment

of a preponderance of the evidence developed at the administrative proceedings and any further

evidence presented by the parties.  *See id*.


**B.      New York's Regulatory Scheme**

As a recipient of federal funds under IDEA, New York State is required to comply with

the IDEA's requirements.  *See Walczak*, 142 F.3d at 123.  New York State has assigned

responsibility for developing appropriate IEPs to local Committees for Special Education

("CSEs"), the members of which are appointed by school boards or the trustees of school districts. *See* N.Y. Educ. Law § 4402(1)(b)(1); *see also Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992). In developing an individual child's IEP, the CSE is required to consider the following factors: (1) academic achievement and learning characteristics; (2) social development; (3) physical development; and (4) managerial or behavioral needs. *See* 8 N.Y.C.R.R. § 200.1(kk)(2)(i). An IEP is not required to include short-term objectives or benchmarks unless the CSE has made a determination that the student will participate in alternative assessments, rather than participate in state and local assessments. *See* 8 N.Y.C.R.R. § 200.4(2)(iv).

New York further requires that an IEP identify the child's specific class placement. *See* 8 N.Y.C.R.R. § 200.4(c)(2)(ix). In order to be grouped together in the same class, students must have sufficiently similar academic levels and learning characteristics so that each child will have the opportunity to achieve his or her annual goals. *See* 8 N.Y.C.R.R. § 200.6(a)(3)(i). Students may be grouped together in a special education class if they have the same disabilities or if they have "differing disabilities [but] . . . similar individual needs for the purpose of being provided a special education program." 8 N.Y.C.R.R. § 200.1(jj); *see also* 8 N.Y.C.R.R. § 200.6(g)(3). It is the responsibility of the CSE to assure that the "social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided." 8 N.Y.C.R.R. § 200.6(a)(3)(ii). The New York regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement, and that the CSE must also consider the management needs of the students in a class so that no student unduly interferes with others' ability to learn. 8 N.Y.C.R.R. § 200.6(a)(3)(ii); *see also* 8 N.Y.C.R.R. § 200.6(a)(3)(iv). Children whose disabilities present particular management concerns should be placed in smaller-than-average size classes, depending

on the degree of intervention required.  *See* 8 N.Y.C.R.R. § 200.6(g)(4).

**C.**     **Factual Background**

*1. 2002-2007 School Years*

G.M. entered elementary school at Boght Hills Elementary School in the North Colonie Central School District and had the same Certified Special Education Teacher, Mary Yodis, from the time she was in first grade until sixth grade.  *See* Dkt. No. 9 at ¶ 7.  During G.M.'s kindergarten year, she underwent a psychological evaluation which found that she functioned in the impaired range with a full scale IQ of 60, and engaged in "shut down" behavior and displayed distractibility.  *See id.* at ¶¶ 34, 35.  The evaluating psychologist predicted that "mathematics concepts will likely be very difficult for G.M. to acquire" and concluded that "care must be taken to challenge G.M. without setting expectations that are well above her developmental levels," as this could cause "frustration and a decreased sense of efficacy in how she perceives herself academically."  *See id.* at ¶ 38.  Generally, G.M. was very social outside of the classroom and other students were very kind to her.  *See id.* at ¶ 30.  In the classroom, however, she was very quiet.  *See id.* at ¶ 31.  In 2004, near the end of G.M.'s second grade year, an assessment of her academic progress revealed that Defendant's attempt to integrate G.M. in the regular classroom setting for math lessons had "further confuse[d] [G.M.] from her basic concepts."  *See id.* at ¶ 48. The report indicated that G.M. had the ability to learn rote factual information after frequent repetition, but this did not equate into a true conceptualization or actual ability to retain the information.  *See id.* at ¶ 49.

In 2005, Plaintiff withheld consent for G.M.'s triennial reevaluation.  *See id.* at ¶ 51. Instead, the District's Psychologist, Timothy Fowler, conducted a review of G.M.'s education file.

*See id*.  Mr. Fowler found that G.M. continued to require significantly modified lessons in all academic areas, new information to be broken down into manageable parts, and the opportunity for small group instruction at her level.  *See id*. at ¶ 53.  He recommended that G.M. continue to receive more specialized instruction and have additional testing, and found that the recommendations from G.M.'s kindergarten evaluation continued to be appropriate.  *See id*. at ¶¶ 54-55.

### 2. 2007-2008 School Year

During the 2007-2008 school year, when G.M. was in the sixth grade, it became increasingly difficult to integrate G.M. with her peers, and very little integration took place between G.M. and students in regular classes.  *See id*. at ¶ 11.  She received special education consultant teacher services in science, social studies, language arts and writing, which took place in the typical classroom.  *See id*. at ¶ 12.  While in the regular classroom, a teaching assistant was present and G.M. received modified presentations that were based on similar concepts as those presented to other students.  *See id*. at ¶¶ 14-18.  For reading and math, G.M. received private instruction outside the classroom.  *See id*. at ¶ 13.  The special education teacher who provided services to G.M. worked in collaboration with the general education teacher, and the two met daily to exchange lesson plans and discuss how best to modify and present G.M.'s lessons.  *See id*. at ¶ 19.  Ms. Yodus, who was G.M.'s resource room teacher, consultant teacher, and tutor over the summers in reading and math, attempted to obtain text at a second grade reading level that would present sixth grade concepts.  *See id*. at ¶¶ 9, 20.

G.M. needed instructions broken down, language simplified, and responded better when information was presented visually.  *See id*. at ¶ 21.  Due to her visual style, G.M. lost interest in

reading material that did not have pictures. *See id*. at ¶ 23.  She was able to decipher vocabulary

and decode words, but struggled with reading comprehension. *See id*. at ¶ 21.

Just prior to the beginning of the 2007-2008 school year, Plaintiff continued to withhold

consent for any reevaluation or cognitive testing. *See id*. at ¶ 56.  This included the sixth grade

cognitive ability testing, and meant that the CSE had to prepare G.M.'s IEP without the benefit of

any new evaluative material. *See id*. at ¶¶ 56-57.


### *3. 2008-2009 School Year*

Since Plaintiff withheld consent for further evaluations and cognitive testing, G.M.'s

2008-2009 IEP was developed without the benefit of new evaluative material. *See id*. at ¶ 58.

For the 2008-2009 school year, G.M.'s IEP included placement in regular core classes to be

taught by regular education teachers, with a special education consultant teacher assigned to work

exclusively with G.M. in each class for thirty minutes per period. *See id*. at ¶ 112.  The regular

education teacher worked with the consultant teacher to modify the curriculum presented to G.M.

*See id*. at ¶ 113.  G.M. was also assigned an aide to assist her with organization. *See id*. at ¶ 116.

The IEP did not contain short-term objectives, because G.M. did not receive an alternative

assessment; instead, she was expected to participate in the same state and local assessments

administered to typical students. *See id*. at ¶ 117.

On November 17, 2008, the CSE amended G.M.'s IEP to provide an Academic Skills-II

class daily, which the CSE felt would better address her academic needs. *See id*. at ¶ 125.

Plaintiff agreed to this change. *See id*. at ¶ 126.  At the beginning of the school year, Ms. Betts

was G.M.'s consultant teacher, however, in December, Ms. Kibler assumed this role. *See id*. at ¶

132.  After Plaintiff and Ms. Kibler had a disagreement over the services provided to G.M., she

was replaced by Ms. Betts for the remainder of the 2008-2009 school year.  *See id*. at ¶¶ 133, 135.
The basis for the disagreement was that Ms. Kibler believed that G.M.'s consultant teacher
services were not sufficient and that G.M. was not benefitting from her time in mainstreamed
classes.  *See id*. at ¶ 134.  The parties do not dispute that G.M. received each and every special
education and related service, modification, and accommodation contained in her 2008-2009 IEP.
*See id*. at ¶ 137.


### 4. 2009-2010 School Year

In the 2009-2010 school year, when G.M. was in the eighth grade, she continued to
struggle to comprehend the instruction in the classroom and was increasingly demonstrating
emotional behavioral issues, including crying in the classroom, falling asleep in the classroom,
and not complying with directions.  *See id*. at ¶ 40.  She received significantly modified
curriculum in her mainstream classes and was responsible for understanding only a few key
classroom concepts.  *See id*. at ¶ 66.  She received modified testing and limited multiple choice
responses as accommodations.  *See id*.  During an October 2009 observation, G.M. was on task
approximately 50 percent of the time and, when she was not paying attention, she was "putting
her head on her desk, rubbing her eyes, looking around the room, looking for papers, observing
other students, poking at peers, playing with her shoe laces, getting tissues, getting a drink, going
to the bathroom, asking to call her mother, crying and closing her eyes."  *See id*. at ¶ 68.


For the 2009-2010 school year, G.M.'s Academic Skills Class ("ACS") teacher, Gregory
Bell, worked with Plaintiff to develop the IEP.  *See id*. at ¶ 139.  On June 23, 2009, the CSE met
to plan G.M.'s 2009-2010 school year.  *See id*. at ¶ 140.  The CSE and Plaintiff agreed on an IEP

that included special reading instruction with no more than five other students, special math instruction, special ASC-II instruction, a consultant teacher for the same three subjects as the prior school year, speech/language therapy, occupational therapy, an aide to assist with organization, and individual services during an extended school year.  *See id*. at ¶¶ 141, 142.

Early in the 2009-2010 school year, Plaintiff requested a program review of G.M.'s reading program.  *See id*. at ¶ 60.  Defendant offered to have an independent reading evaluation conducted by local reading consultant, Dr. Melinda Tanzman.  *See id*. at ¶¶ 60-61.  Plaintiff withheld consent for the evaluation.  *See id*.  On November 16, 2009, a CSE meeting was held in response to Plaintiff's request to provide G.M. with a one-on-one reading specialist.  *See id*. at ¶ 70.  District Psychologist, Miel Fajen, stated concern that adding additional support might cause additional emotional issues for G.M. and recommended updated testing to assess her capability and the appropriateness of existing programming.  *See id*. at ¶¶ 70,71.  Additional concern was raised that G.M. would not benefit from an individual reading program because she needs the motivation of other students in order to read, discuss, and engage in the material.  *See id*. at ¶ 145.  The IEP was amended at this meeting to reflect this discussion and the parties do not dispute that G.M. received each and every special education and related service, modification, and accommodation contained in her 2009-2010 IEP.  *See id*. at ¶ 148.

### 5. The 2010-2011 School Year

In March 2010, Defendant began working on G.M.'s IEP for the 2010-2011 school year. *See id*. at ¶ 183.  A team of faculty, as well as Plaintiff, met three or four times in the Spring of 2010.  *See id*.  Mr. Shumway, G.M.'s special instructor for social studies, was very concerned about her ability to stay awake and stay focused, and recommended that she be removed from

mainstream social studies for her ninth grade year.  *See id*. at ¶ 186.  The CSE recommended that

G.M. continue to be mainstreamed in English because she enjoyed literature and for socialization

purposes, and also recommended that G.M. be mainstreamed for Science in Our Lives, which she

could take over a three-year period.  *See id*. at ¶ 188.  The IEP offered G.M. a self-contained math

class to address her weak math skills, as well a self-contained social studies class, which was

her weakest area and the class she liked least.  *See id*. at ¶ 192.  The plan also included an ASC to

provide assistance with her mainstream English and science classes, a special instruction reading

class to address her ongoing reading issues, as well as a one-on-one aide to help her stay focused

on classroom material and to assist with note taking in her mainstream classes.  *See id*.  The IEP

recommended a parallel remedial curriculum, which would allow G.M. to be mainstreamed for

certain classes, but did not include Carnegie credits for the time spent in those courses.  *See id*. at

¶ 193.

Plaintiff objected to the IEP on the grounds that G.M. should receive Carnegie credits for

her mainstream classes.  *See id*. at ¶ 198.  Carnegie credits are awarded to students who achieve

the prescribed learning outcomes for a given class and are based on 180 minutes of study of a

particular subject per week during the school year.  *See id*. at ¶ 197.  The CSE, however,

concluded that because of G.M.'s significant deficits, she could not be placed in mainstream

classes for Carnegie credits.  *See id*. at ¶ 196.  The CSE felt that at the time the 2010-2011 IEP

was developed, G.M. did not have the skills to be successful in a mainstream classroom with

Regents level curriculum because she had cognitive, skill, and emotional deficits that prevented

her from benefitting from a full Regents curriculum.  *See id*. at ¶ 195.

On June 22, 2010, the CSE held a meeting to discuss the proposed IEP.  *See id*. at ¶ 201.

Plaintiff's position was that G.M. should be mainstreamed in every class so that she could earn

Regents or local diploma credit.  *See id*. at ¶ 202.  Plaintiff advocated for no program or testing

modifications, no aide support, and no life skill instruction or speech and language services.  *See*

*id*.  The teachers present at the meeting, however, stated that G.M. needed to work on functional

life skills, particularly in her math and reading curriculums.  *See id*. at ¶ 201.  At this meeting,

Defendant informed Plaintiff that the proposed IEP did not mean that G.M. could not ultimately

obtain a local or Regents diploma, but that they thought it prudent to address skill deficits with

the hope that G.M. could eventually be further mainstreamed and receive a diploma.  *See id*. at ¶

204.  In response to disagreement over G.M.'s 2010-2011 IEP, the CSE Chairperson suggested

that G.M. undergo updated psychological testing and offered to have an independent evaluator

conduct the testing if Plaintiff was uncomfortable having the testing performed by the District's

Psychologist.  *See id*. at ¶¶ 62, 63.  Plaintiff refused to grant permission for further testing and

evaluations.  *See id*. at ¶¶ 60, 71.

    In October 2010, Plaintiff consented to further evaluations of G.M.  *See id*. at ¶ 73.  Ms.

Fajen performed a psychoeducational evaluation of G.M., provided questionnaires to teachers and

G.M.'s parents, and interviewed G.M.  *See id*. at ¶ 74.  Plaintiff did not return the questionnaire.

*See id*. at ¶ 75.  Ms. Fajen reviewed previous evaluations conducted during G.M.'s kindergarten

and second-grade years.  *See id*. at ¶ 76.  She found that G.M.'s academic performance was

variable, depending on her level of engagement.  *See id*. at ¶ 65.  She also found that the concerns

articulated during G.M.'s kindergarten evaluation were consistent with those expressed by G.M.'s

teachers during the 2009-2010 school year.  *See id*. at ¶ 38.  Ms. Fajen's evaluation found that

G.M. was able to get through her daily schedule with minimal adult assistance.  *See id*. at ¶ 77.

Her teachers reported that the mainstream instruction she received during the eighth grade year

was far beyond her comprehension level and that her presence in those classes was detrimental to

her.  *See id*. at ¶ 78.  G.M.'s consultant teacher reported that she needed curriculum modifications to a second-grade level for concepts.  *See id*. at ¶ 38.

In November 2010, G.M. participated in additional testing, in which she received among the lowest scores possible, and showed significant delays in her cognitive ability.[3]  *See id*. at ¶ 81. G.M. scored a full scale IQ of 40, which is in the moderate to severe range of mental retardation. *See id*. at ¶ 82.  Ms. Fajen concluded that ninth-grade curriculum content was beyond G.M.'s comprehension abilities, and that G.M. demonstrated a knowledge of first-grade curriculum and some second-grade skills.  *See id*. at ¶¶ 84, 88.  Her math skills were consistent with students in kindergarten.  *See id*. at ¶ 89.  Ms. Fagan concluded that Defendant needed to provide G.M. with skills which would allow her to adapt to and function in her environment as an adult, and concluded that G.M. was not benefitting from the receipt of grade-level programming.  *See id*. at ¶ 93.

### 6. Dr. Thomas' Evaluation

After the impartial hearing began, Plaintiff retained Dr. Randall Thomas to conduct an independent psychological evaluation of G.M.  *See id*. at ¶ 94.  Plaintiff's goal in seeking this evaluation was to find the best means of educating her daughter within the general education curriculum and to identify her daughter's learning style and needs so that she could maximize her learning potential within that setting.  *See id*. at ¶ 95.  Prior to the evaluation, Plaintiff told Dr. Thomas that G.M. thrived with non-disabled peers and desired to remain within the mainstream. *See id*. at ¶ 96.  Dr. Thomas observed that G.M. was moodier than the other children in her class

---

[3] Plaintiff disagrees, contending that G.M. correctly answered several items on every subtest.  *See* Dkt. No. 13-2 at ¶ 81.  This disputed fact is not material to the Court's determination of the pending motions.

and was a relatively reticent class participant.  *See id*. at ¶¶ 98, 99.  She had virtually no interaction with other children in the classroom.  *See id*. at ¶ 100.  Her test scores for the ability to retain and process sequential information were lower than 99.9 students out of every 100 students tested.  *See id*. at ¶ 102.  Dr. Thomas concluded that the academic pressure G.M. experienced while in mainstream classes needed to be addressed, and that fulfilling all of the requirements for a Regents diploma was not within her ability level.  *See id*. at ¶¶ 108, 111.  He found that the goals and curriculum contained in the IEP were consistent with his evaluations and appropriate and reasonable given G.M.'s abilities.  *See id*. at ¶ 111.


**D.      Impartial Hearing**

On September 7, 2010, Plaintiff requested a due process hearing.  *See id*. at ¶ 72.  The hearing request alleged that G.M. was denied a FAPE for the 2008-2009, 2009-2010, and 2010-2011 school years.  *See* Dkt. No. 13-3 at 4.  For the years 2008-2009 and 2009-2010, Plaintiff alleged that Defendant failed to fully implement the IEPs and failed to teach G.M. to grade level standards.  *See id*.  The request alleged that the 2010-2011 IEP failed to offer a FAPE in the LRE because the IEP did not contain sufficient mainstream opportunities.  *See id*.  The request also alleged that Defendant failed to adequately address G.M.'s social, emotional, academic and management needs, failed to accurately state her present levels of performance and needs, failed to offer short-term objectives as required by law, and failed to allow her to earn Carnegie credits.  *See id*.  Plaintiff also alleged that Defendant violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by denying G.M. an inclusive program that provided the opportunity to earn Carnegie credits toward a Regents diploma.  *See id*.

The impartial hearing was held on November 15 and 16, December 6, 7, 9, and 21 of

2010, and on March 1, 2011.  *See id*.  Michael Lazan was appointed as the IHO.  *See id*.  At the

time of the hearing, G.M. was chronologically in the tenth grade and was performing at a second-

grade level in reading and math.  *See* Dkt. No. 9 at ¶¶ 3, 25.  At the hearing, Defendant called

David Semo, Virginia McQuade, Tara Carney, Martha Keer, Gregory Bell, Christopher

Shumway, and Miel Fagan as witnesses.  *See* Dkt. No. 13-3 at 4.  Plaintiff offered testimony from

herself, Mary Yodus, and Dr. Thomas.  *See id*.  Approximately eighty-four (84) exhibits were

received into evidence.  *See id*. at 4-5.

 The IHO rendered a decision on June 13, 2011 and concluded that the IEP for 2010-2011

denied G.M. a FAPE.  *See* Dkt. No. 10-4 at 13.  Despite finding that Defendant met its obligation

to educate G.M. in the LRE, the IHO found that the 2010-2011 IEP did not adequately address

her social, emotional, academic and management needs.  *See id*.  Based on numerous examples of

behavioral issues reflected in the record, the IHO concluded that the IEP did not adequately

address G.M.'s behavioral issues and a functional behavior assessment ("FBA") should have been

performed.  *See id*.  The IHO determined that G.M. would benefit from individualized reading

instruction and found the IEP deficient for failing to provide this service.  *See id*. at 17.  He

ordered prospective individual reading instruction to compensate for this deficiency.  *See id*. at 25

He further ordered that a consultant teacher, rather than an aide, be assigned to G.M.'s mainstream

classes for the 2010-2011 school year.  *See id*.

 The IHO determined that all other aspects of the 2010-2011 IEP were adequate.  He found

that the IEP accurately reflected G.M.'s present levels of performance, that Defendant was not

required to alternatively assess or provide short-term goals in G.M.'s IEP, and that there was

nothing in the record to support a finding that G.M. was being exempted from state standards,

which would require short-term objectives to be included in her IEP.  *See id*. at 13-15.  He also

concluded that issues relating to how course credits or graduation requirements are calculated are beyond an IHO's jurisdiction.  *See id*. at 18.

The IHO concluded that while some provisions of the 2008-2009 and 2009-2010 IEPs were not properly implemented, these errors did not rise to the level of a denial of a FAPE.  *See id*. at 19, 23.  The IHO found that the 2009-2010 IEP was not properly implemented because G.M.'s special reading instructor, Ms. Carney, was supervising another class at the same time she was scheduled to teach reading to G.M.  *See id*. at 20.  The IHO also found that Defendant failed to show that G.M. was provided with a calculator and failed to show that G.M. received the requisite homework modifications in science, in accordance with the IEP.  *See id*. at 20-21.  Regarding the 2008-2009 IEP, the IHO found that some of the math goals contained in the IEP were not implemented and that G.M.'s consultant teacher was not certified to teach seventh grade.  *See id*. at 21-22.  The IHO denied Plaintiff's claims that the IEP required Ms. Betts' replacement, Ms. Kibler, to receive additional training, and that G.M. should have been taught to the learning standards of the grade she was in.  *See id*. at 19, 22.  He concluded that despite the fact that Defendant did not perfectly implement all of the goals for the 2008-2009 and 2009-2010 IEPs, the record showed that G.M. showed sufficient progress and that these failures did not materially impact her ability to learn so as to constitute the denial of a FAPE.  *See id*. at 21, 23.

The IHO dismissed Plaintiff's Section 504 claim, finding that Plaintiff failed to demonstrate that the district acted in "bad faith" or that it exercised "gross misjudgment."  *See id*. at 24.

**E.      Appeal to the State Review Officer**

Defendant appealed the IHO's decision to the SRO.  *See* Dkt. No. 10-5 at 2.  Although

Plaintiff cross-appealed the IHO's decision, the SRO found the grounds for the cross-appeal "unduly vague and ambiguous." *See id*. at 14. On the cross-appeal, Plaintiff raised for the first time a request for compensatory education services in the form of 360 hours of reading instruction. *See id*. The SRO issued a decision on August 22, 2011, sustaining Defendant's appeal and dismissing Plaintiff's cross-appeal. *See id*. at 14, 17. The SRO found that Defendant adequately implemented the 2008-2009 and 2009-2010 IEPs, and that the claims regarding the 2010-2011 IEP were moot. *See id*. at 12,15.

Specifically, the SRO found that allegations that the 2008-2009 and 2009-2010 IEPs were not adequately implemented were unfounded. *See id*. at 13. The SRO determined that the fact that G.M.'s special education reading teacher was simultaneously supervising a teacher's assistant assigned to an ASC class did not prevent the teacher from properly implementing the IEP, and that G.M. made significant progress with respect to her reading over the course of the school year. *See id*. The SRO found that Defendant's failure to provide G.M. with a calculator during the 2009-2010 school year was not material to the implementation of the IEP. *See id*. The SRO also found that while the hearing record did not expressly describe the homework modifications made for G.M. in science, the record showed that G.M. received modifications in all of her other general education subjects, and therefore did not support a finding that the failure to modify the science homework amounted to a material failure to implement the IEP. *See id*.

The SRO dismissed Plaintiff's cross-appeal, finding that Plaintiff failed to provide particular reasons as to why the IHO's decision was incorrect, which precluded meaningful review. *See id*. at 14. Additionally, the SRO found that Plaintiff's request for an additional 360 hours of reading instruction was improperly raised for the first time in the cross-appeal, and was not included in the original due process complaint. *See id*.

17

The SRO concluded that all claims pertaining to the 2010-2011 school year were moot, as the school year had concluded at the time of the administrative hearing, thus no meaningful relief could be provided regarding the 2010-2011 IEP. *See id.* at 15. The SRO acknowledged that in situations where the conduct complained of is capable of repetition, yet possible of evading review, the end of a school year for which an IEP was written will not automatically render the claim moot; however, the SRO found that this exception to the mootness doctrine was inapplicable in the present case. *See id.* Specifically, the SRO found that there was no reasonable expectation that the conflict over how much time G.M. spent in a mainstreamed setting would recur, because updated evaluative testing that took place after the due process request was made would likely lead to an accurate and appropriate placement for 2011-2012, and there was no evidence at the time of the review that Plaintiff challenged the appropriateness of the 2011-2012 IEP. *See id.*

The SRO further found that the IHO erred in ordering relief for the 2011-2012 school year, because such relief was premature. *See id.* Since the 2011-2012 IEP was not at issue and not reviewed during the impartial hearing, the SRO concluded that it was premature for the IHO to direct Defendant to provide G.M. with individualized reading instruction, conduct an FBA and a Behavior Intervention Plan ("BIP"), and provide consultant teacher services for her elective classes. *See id.*

### III. DISCUSSION

**A.    Summary Judgment Standard**

A motion for summary judgment in an action brought under the IDEA involves a somewhat different inquiry than a standard motion for summary judgment because "'the existence of a disputed issue of material fact will not defeat the motion.'" *J.S. ex rel. Y.S. v. North Colonie*

18

*Cent. Sch. Dist.*, 586 F. Supp. 2d 74, 81 (N.D.N.Y. 2008) (quoting *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004)).  The inquiry "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.  It matters not, in this context, who initiates the motion."  *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996) (internal footnotes omitted).

A federal court reviewing the findings and conclusions of an administrative proceeding under the IDEA must, after reviewing the records from the proceeding and receiving additional evidence at the request of the parties, make an independent decision based on the preponderance of the evidence.  *See P. ex rel. Mr. P. v. Newington Bd. of Educ.*, 512 F. Supp. 2d 89, 98 (D. Conn. 2007) (citation omitted).  Independent judicial review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review."  *Rowley*, 458 U.S. at 206.  While federal courts "do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206).  "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."  *Id*.  When an IHO and SRO reach differing conclusions, the reviewing federal court should defer to the final decision of the state authorities, which is the SRO's decision.  *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

**B.**      **Consent for Updated Evaluations**

Defendant argues that Plaintiff is precluded from alleging that G.M. was denied a FAPE because she withheld consent for updated evaluations and testing for the nine years preceding the filing of the due process hearing request. *See* Dkt. No. 11 at 11. Paradoxically, Plaintiff claims that a FAPE was denied because Defendant failed to perform an FBA.

The IDEA requires school districts to reevaluate students with disabilities at least once every three years to ensure that educational programs are well-suited to the student's evolving needs. *See Schaffer v. Weast*, 546 U.S. 49, 53 (2005); 34 C.F.R. § 300.534. The IDEA also requires that a parent "must be informed about and consent to evaluations of their child under the Act." *Id*. (citing 20 U.S.C. § 1414(d)(1)(B)). The IDEA further provides that, if a parent does not provide consent for an evaluation, the district may pursue an override of the parent's decision by utilizing the due process procedures contained in 20 U.S.C. § 1415. *See* 20 U.S.C. § 1414(a)(1)(D)(ii). As Defendants correctly point out, the language of the statute is permissive; and, therefore, a school district is not obligated to obtain an updated evaluation after a parent has refused consent. *See Fitzgerald v. Camdenton R-III Sch. Dist.*, 439 F.3d 773, 776 (8th Cir. 2006) (citations omitted).

The IDEA provides that if a parent refuses to consent to the receipt of special education and related services, or fails to respond to a request to provide such consent, "the local educational agency shall not be considered to be in violation of the requirement to make available a free appropriate public education to the child for the failure to provide such child with the special education and related services for which the local educational agency requests such consent." 20 U.S.C. § 1414(a)(1)(D)(ii)(III)(aa). Although a parent always retains the right to withhold consent for further evaluations, after consent is withheld, the school district cannot be held liable for denying a FAPE. *See M.L. v. El Paso Ind. Sch. Dist.*, 610 F. Supp. 2d 582, 599

(W.D. Tex. 2009) (citing 20 U.S.C. § 1414(a)(1)(D)(ii)(III)(aa)) (other citations omitted).  A parent seeking special education services for their child under the IDEA must allow the school to evaluate the student and cannot force the school to rely solely on an independent evaluation.  *See Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1315 (9th Cir. 1987); *see also Dubois v. Conn. State Bd. of Ed.*, 727 F.2d  44, 48 (2d Cir. 1984) (interpreting the IDEA's predecessor and holding that the school system may insist on evaluations by qualified professionals).

The Court finds that Plaintiff's repeated failure to provide Defendant with consent to perform updated evaluations precludes her from asserting that G.M. was denied a FAPE for the 2008-2009, 2009-2010, and 2010-2011 school years.  For the purpose of completeness, the Court will still address Plaintiff's specific challenges to the IEPs on the merits.


**C.    2008-2009 and 2009-2010 School Years**

Plaintiff argues that G.M. was denied a FAPE in 2008-2009 because Defendant failed to implement all of the math goals contained in the IEP and because G.M.'s consultant teacher was not certified to teach seventh grade.  *See* Dkt. No. 13-3 at 20-21.  Plaintiff also alleges that a FAPE was not provided in 2009-2010 because G.M.'s special reading instructor was simultaneously teaching an English class, G.M. was not provided a calculator, and G.M. did not receive appropriate homework modifications.  *See id*.  The IHO concluded that these allegations were not sufficient to support denial of a FAPE.  *See* Dkt. No. 10-4 at 21-23.  The SRO affirmed the IHO's decision.  *See* Dkt. No. 10-5 at 13.

"'[A] party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP.'"  *D.D-S.*

*v. Southhold Union Free Sch. Dist.*, No. 09-CV-5026, 2011 WL 3919040, *13 (E.D.N.Y. Sept. 2, 2011 (citing *Houston Ind. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)); *see also A.P. v. Woodstock Bd. of Educ.*, 370 Fed. Appx. 202, 204 (2d Cir. 2010).

In the present matter, the IHO found that certain aspect's of the IEP for 2008-2009 and 2009-2010 were not properly implemented, but both the IHO and the SRO found insufficient evidence to show that these failures impacted a significant or substantial aspect of G.M.'s IEPs. *See* Dkt. No. 20-15 at 13.  The decisions of both the IHO and SRO are well-reasoned and reflect a careful examination of the record.  After conducting an independent review of the administrative record in this matter, as well as considering the parties' supplemental submissions, the Court finds that the preponderance of the evidence shows that the 2008-2009 and 2009-2010 IEPs did provide G.M. with a FAPE.  As the *Rowley* court articulated, while an IEP need not maximize the potential of a disabled student, it must provide "meaningful" access to education, and confer "some educational benefit" upon the child for whom it is designed.  *See Rowley*, 458 U.S. at 200. The record before the Court shows that in each of the challenged school years, Defendant carefully considered G.M.'s academic, social, and behavioral needs and provided the requisite services that were tailored to her specific needs and "reasonably calculated to enable [G.M.] to receive educational benefits."  *Id.* at 207.

There is little evidentiary support for Plaintiff's contentions that the fact that Ms. Carney was also supervising an English class, or that G.M. was not provided a calculator, or that she did not receive appropriate modifications to her science homework amount to a failure to "implement substantial or significant portions of the IEP." *Bobby R.*, 200 F.3d at 349.  During the 2008-2009 and 2009-2010 school years, Defendant provided G.M. with an academic program that was tailored to meet her individual needs and reasonably calculated to produce academic benefit.  *See*

*Rowley*, 458 U.S. at 200.  This included placement in regular core classes with a special education consultant present to work exclusively with G.M. for thirty minutes per period, an aide to assist with organization, and the addition of an ACS skills-II class.  *See* Dkt. No. 9 at ¶¶ 112-116. During the 2009-2010 school year, as G.M. increasingly demonstrated emotional and behavioral issues, the record reflects that the CSE took these issues into account and made further modifications to G.M.'s IEP.  *See* Dkt. No. 9 at ¶ 148.

Based on the foregoing, the Court finds that the SRO and the IHO correctly determined that G.M. was provided with a FAPE for the 2008-2009 and 2009-2010 school years.

**D.     2010-2011 School Year**

*1. Mootness*

The SRO dismissed Plaintiff's claims regarding the 2010-2011 school year as moot, finding that no relief could be provided because the 2010-2011 school year had ended.  *See* Dkt. No. 10-5 at 15.  Plaintiff objects to that finding, arguing that the claims are capable of repetition, while evading review.  *See* Dkt. No. 13-3 at 11-12.

The mootness doctrine is rooted in the "case or controversy" requirement of Article III of the United States Constitution, which requires that a live controversy exist before a court at all times during the pendency of a litigation.  *See DeFunis v. Odegaard*, 416 U.S. 312, 306-317 (1974) (citation omitted).  When the issues in dispute between the parties "are no longer 'live,'" the case becomes moot.  *See Powell v. McCormack*, 395 U.S. 486, 496 (1969).  Whenever mootness occurs, the court loses jurisdiction over the suit and the matter must be dismissed.  *See Russman v. Bd. of Educ.*, 260 F.3d 114, 118-119 (2d Cir. 2001) (citation omitted); *Fox v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (citation omitted).

23

"A party seeking to have a case dismissed as moot bears a heavy burden." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (citations omitted).  Mootness is particularly challenging in the context of a challenge to a student's IEP.  Due to the changing nature of a student's IEP from one school year to the next, mootness "'is a recurring phenomenon in students' suits to vindicate . . . rights associated with the conditions of their education.'" *Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist.*, 583 F. Supp. 2d 422, 428 (W.D.N.Y. 2008) (quotation omitted).  Typically, courts have found mootness when an IEP is challenged after the school year to which the IEP was applicable has ended, and where there was no reasonable expectation that the child would be subject to the same IEP again.  *See id.* at 429 (citation omitted).  Additionally, courts have found mootness when the matter reached the court after the student graduated from the school, *see Russman*, 260 F.3d at 119; where the case involved questions about the qualifications of a personal aide who had resigned from her job without the prospect of rehiring, *see J.N. v. Depew Union Free Sch. Dist.*. No. 07-CV-00533, 2008 WL 4501940, *4 (W.D.N.Y. Sept. 30, 2008); and where the district never complied and never expressed an intent to comply with the IEP that was challenged in the lawsuit, *see Lillbask*, 397 F.3d at 88-89.

An important exception to the mootness doctrine applies when a plaintiff can show that the challenged action is "capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).  Specifically, two circumstances must exist simultaneously: "'"(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party will be subject to the same action again."'" *Id*. (quotations and other citation omitted).  In light of these requirements, the mootness exception "applies only in exceptional situations, and is severely circumscribed."

*Russman*, 260 F.3d at 119 (citation omitted).

In IDEA cases, the first factor is generally satisfied because judicial review of an IEP challenge typically takes longer than the duration of the school year. *See Rowley*, 458 U.S. at 186 n. 9; *see also Lillbask*, 397 F.3d at 85 (citation omitted). The second factor requires that "a reasonable expectation of repetition" must be "more than a theoretical possibility." *B.J.S. ex rel. N.S. v. State Educ. Dep't/Univ. of the State of N.Y.*, 815 F. Supp. 2d 601, 612 (W.D.N.Y. 2011) (quotation omitted). "Mere speculation that the parties will be involved in a dispute over the same issues does not rise to the level of a reasonable expectation or demonstrated probability of recurrence." *Dennin v. Conn. Interscholastic Athletic Conference, Inc.*, 94 F.3d 96, 101 (2d Cir. 1996).

The fact that a plaintiff has repeatedly challenged each IEP developed does not establish the requisite "reasonable expectation" of repetition. *See B.J.S.*, 815 F. Supp. 2d at 613 (holding that the presumption that a plaintiff will continue to challenge an IEP year after year, regardless of what is recommended by the CSE, does not create a "reasonable expectation" of recurrence). The court in *B.J.S.* found that the plaintiff's failure to consent to updated evaluations weighed against the likelihood that the same conduct would recur, because updated evaluations would likely significantly impact recommendations in future IEPs. *See id*. The court further noted that "a party may not, by its own conduct, create the appearance of an actual controversy to avoid mootness." *Id*.

Courts have found conduct "capable of repetition" where the parties demonstrate an ongoing dispute over the district's mainstreaming obligation. *See Sacramento City Unified Sch. Dist. Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir. 1994) (holding that the exception applies where the parents and school district had conflicting educational philosophies regarding

mainstreaming of the student, which were likely to recur); *see also Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1040-1041 (5th Cir. 1989) (finding that the conduct was capable of repetition because the school officials and parents had irreconcilable views on whether to mainstream the student and each side "steadfastly adhere[d] to its perception of the [law's] mainstreaming requirement").

Consistent with the SRO's reasoning, the Court finds that Plaintiff's claim for the 2010-2011 school year does not satisfy this exception to the mootness doctrine. The only remedy Plaintiff sought for the 2010-2011 school year was a new IEP. Since the school year has concluded and the 2010-2011 IEP is no longer applicable, no meaningful relief can be afforded. Additionally, Plaintiff has failed to show that the same conduct is likely to recur. Courts have consistently held that a party's history of challenging the validity of an IEP from year to year is not sufficient to show a reasonable expectation that the same conduct will recur. *See B.J.S.*, 815 F. Supp. 2d at 613 (citation omitted). While the parties disagree as to the proper application of the IDEA's mainstreaming requirement, the record does not demonstrate that this disagreement will not be remedied by updated evaluative material and subsequent changes to G.M.'s IEPs. Since Plaintiff has consented to updated evaluations of G.M., there is a strong likelihood that future IEP's will be more tailored to address G.M.'s specific needs. As the Second Circuit noted in *Lillbask*, the mere possibility that a dispute over a child's mainstreaming will recur is not sufficient to satisfy the exception. *See Lillbask*, 397 F.3d at 88.

Based on the foregoing, the Court finds that Plaintiff's claims with respect to the 2010-2011 school year are moot.

### *2. 2010-2011 FAPE*

26

Plaintiff contends that Defendant failed to offer G.M. a FAPE in the LRE for the 2010-2011 school year. *See* Dkt. No. 13-3 at 12. Plaintiff's primary argument is that the IEP did not offer G.M. enough mainstream opportunities and did not allow her to earn Carnegie credits. *See id.* at 10-18. The IHO found that the IEP provided sufficient mainstream opportunities and declined to address the issue of whether G.M. should be eligible to receive Carnegie credits. *See* Dkt. No. 10-4 at 13. The IHO determined that the 2010-2011 IEP denied G.M. a FAPE because it did not properly address her social, emotional, academic and management needs. *See id.* at 13. Specifically, he concluded that Defendant was obligated to perform an FBA, provide G.M. with individual reading instruction, and provide a consultant teacher, rather than an aide, to assist G.M. in her mainstream classes. *See id.* at 13-17. The SRO disagreed with the IHO, instead finding that the claims for 2010-2011 were moot. *See* Dkt. No. 10-5 at 15.

A school district has fulfilled its obligation to provide a FAPE when (a) the CSE complied with the procedural requirements set forth in the IDEA, and (b) the IEP developed by the CSE is reasonably calculated to enable the student to receive educational benefits. *See Rowley*, 458 U.S. at 206-207. A school district is not required to "furnish . . . every special service necessary to maximize each handicapped child's potential." *Id.* at 199. Rather, a school district "fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 132). Stated another way, while an IEP need not maximize a disabled student's potential, it must provide "meaningful" access to education, and confer "some educational benefit" upon the child for whom it is designed. *See Rowley*, 458 U.S. at 200.

### *a. Education must be offered in the Least Restrictive Environment*

While the IDEA expresses a preference for educating students in the regular education classroom, a child may be removed from the regular education environment "'when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily[.]'" *Mavis v. Sobol*, 839 F. Supp. 968, 982 n.25 (N.D.N.Y. 1993) (quotation omitted).   When determining whether a student can be satisfactorily educated in the regular setting with supplemental aids and services, the following factors should be considered: "'(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.'" *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120 (2d Cir. 2008) (quotation omitted).

The analysis as to whether a school district has mainstreamed a student to the maximum extent appropriate is a fact-specific inquiry, and requires a careful examination of the nature and severity of the child's handicapping condition, his or her needs and abilities, and the school district's response to the child's needs.   *See id.*; *see also Daniel R.R.*, 874 F.2d at 1049.   The court in *Daniel R.* cautioned:

> Furthermore, the Act does not require regular education instructors
> to devote all or most of their time to one handicapped child or to
> modify the regular education program beyond recognition.   If a
> regular education instructor must devote all of her time to one
> handicapped child, she will be acting as a special education teacher
> in a regular education classroom.   Moreover, she will be focusing
> her attentions on one child to the detriment of her entire class,
> including, perhaps, other, equally deserving, handicapped children
> who also may require extra attention.   Likewise, mainstreaming
> would be pointless if we forced instructors to modify the regular
> education curriculum to the extent that the handicapped child is not
> required to learn any of the skills normally taught in regular

28

> education.  The child would be receiving special education
> instruction in the regular education classroom; the only advantage
> to such an arrangement would be that the child is sitting next to a
> nonhandicapped student.

*Id*. at 1048-1049.

A similar challenge was brought in *J.S.*, where the court denied the plaintiff's claim that

the IEP did not provide sufficient mainstreaming opportunities.  *See J.S.*, 586 F. Supp. 2d at 84-

85.  *J.S.* involved many of the same educators and experts involved in the present case.  *See id*.  In

*J.S.*, the district removed the plaintiff from mainstream Global History and English classes based

on his difficulty with language-intensive courses.  *See id*.  Significant testimony by teachers,

school professionals, and outside experts supported the CSE's determination that self-contained

instruction in these courses would provide the plaintiff with a greater benefit than continued

mainstream education.  *See id*.  The court found that the plaintiff's passing grades in his

mainstream classes "pale[d] in comparison" to the testimony documenting his struggles with the

mainstream curriculum in these courses.  *See id*.  Moreover, the plaintiff's repeated failure of

Regents Exam and Regents Competency Assessments in these subjects showed that the

mainstream curriculum was beyond his comprehension.  *See id*.  The court cited the myriad of

services and accommodations provided to the plaintiff to help him succeed in the mainstream

environment as evidence that the district complied with the factors set forth in *Daniel R.R.* before

concluding that self-contained instruction in these subjects was appropriate.  *See id*. (citation

omitted).

In the present case, the Court finds that Defendant met its obligation to provide G.M. with

a FAPE in 2010-2011.  The record demonstrates that G.M. struggled significantly in her

mainstream classes, even when the curriculum was modified and extra consultant teacher services

were provided.  *See* Dkt. No. 9 at ¶¶ 186, 188, 192, 196.  While Defendant created the 2010-2011

IEP without the benefit of updated evaluative material, numerous faculty who worked with G.M. observed that exposing her to mainstream curriculum that was well beyond her learning capabilities actually caused G.M. to regress, both behaviorally and academically. *See id.* at ¶ 78, 195.  Consequently, the 2010-2011 IEP proposed that G.M. only be mainstreamed in English and science, and receive specialized instruction in an ASC-II skills class, ASC social studies class, math, and reading. *See id.* at ¶ 192.  The record shows that the CSE did not arrive at this program lightly, and that Plaintiff and numerous faculty and support personnel familiar with G.M.'s unique needs were consulted throughout the development of the IEP. *See id.* at ¶ 183.  Dr. Thomas, Plaintiff's own witness, further corroborated that at the time the 2010-2011 IEP was created that G.M. did not have the ability to earn a Regents diploma and would benefit from the specialized instruction contained in the IEP. *See id.* at ¶¶ 108, 111.

Plaintiff argues that G.M.'s success in a mainstreamed curriculum throughout elementary and middle school shows that she received academic benefit from mainstreamed curriculum. *See* Dkt. No. 13-3 at 11.  The record before the Court, however, indicates that G.M. did not possess the requisite abilities to continue to benefit from a completely mainstreamed curriculum.  Updated evaluations showed that G.M.'s math skills were consistent with a student in kindergarten and that, while she demonstrated a knowledge of a first-grade curriculum, she did not have a mastery of second-grade skills. *See* Dkt. No. 9 at ¶¶ 88, 89.  The significant discrepancy in her skill level and the level of material presented in a mainstream classroom setting supports a finding that G.M. would not receive an academic benefit from continued placement in mainstream curriculum for all subjects, and that continued mainstreaming would likely lead to a further regression in G.M.'s academic, behavioral and emotional development. *See id.* at ¶¶ 93, 111.  In the years preceding G.M.'s ninth-grade year, she received significantly modified curricula and individual teaching

assistance in her mainstream classes.  Despite this assistance, G.M. was still unable to

comprehend the material.  Consequently, Defendant's decision to limit her mainstream

opportunities to English and science were appropriate and reasonably calculated to provide G.M.

with an academic benefit.

       The Court also finds that Defendant adequately considered G.M.'s social, academic,

emotional, and management needs in the development of the IEP.  After careful consideration, the

CSE determined that G.M. could still retain some educational benefit from a mainstreamed

science and English curriculum, because she was more likely to remain actively engaged in those

subjects because they interested her, and because the curriculum could be modified to allow G.M.

to benefit without detracting from the learning environment of the other students.  *See id*. at ¶¶

188, 193.  This decision was not based solely on G.M.'s academic needs, but reflects a careful

consideration of behavioral, social, and management factors.

### b. Designation of Plaintiff's Diploma

       Plaintiff also objects to the IEP because it does not allow G.M. to earn Carnegie credits

for her mainstream courses, and thereby prevents her from earning a Regents diploma.  *See* Dkt.

No. 13-3.  Defendant contends that the 2010-2011 IEP does not preclude G.M. from earning a

Regents diploma in the future, but that earning Carnegie credits in her mainstream classes is

currently outside G.M.'s ability.  *See* Dkt. No. 15 at 24.

       Under the IDEA, a student with a disability is eligible to earn a high school diploma until

his or her twenty-first birthday.  *See* 20 U.S.C. § 1412(a)(1)(A); 8 N.Y.C.R.R. § 100.9(e).  At the

time this action was brought, G.M. was fifteen years old, thus Defendant's contention that she still

has ample time to earn a Regents diploma is correct.  Given G.M.'s significant deficits, however,

Defendant's decision that G.M. would not receive Carnegie credit for her course work for 2010-2011 does not amount to a violation of the IDEA.  *See J.S.*, 586 F. Supp. 2d at 86 (holding that the district's decision that the plaintiff could only pursue an IEP diploma was reasonably calculated to benefit the plaintiff and was in conformity with the requirements of the IDEA).  The record shows that G.M. struggled substantially with her mainstream course work, even with significant modifications and accommodations.  Therefore, granting Plaintiff's request that G.M. receive no accommodations or modifications to the mainstream curriculum would almost certainly deprive G.M. of any educational benefit.  Consequently, the Court finds that Defendant's decision to award G.M. IEP credit is consistent with the provisions of the IDEA and is reasonably calculated to provide her with educational benefit.

### c. Functional Behavior Assessment

The Court also finds that the IHO's conclusion that Defendant was required to conduct an FBA is misguided.  The IDEA "incorporates some but not all state law concerning special education."  *Bay Shore Union Free Sch. Dist. v. Kain ex rel. Kain*, 485 F.3d 730, 734 (2d Cir. 2007) (citation omitted).  The IDEA requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).  A New York State regulation requires a school district to conduct an FBA as part of its initial evaluation "for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities."  8 N.Y.C.R.R. § 200.4(b)(1)(v).  The purpose of conducting an FBA is to ascertain "why the student engages in behaviors that impede learning

and how the student's behavior relates to the environment."  8 N.Y.C.R.R. § 200.1(r).

Thus, under both New York State law and the IDEA, the decision of whether an FBA is warranted is left to the discretion of school officials.  A district's failure to conduct an FBA does not amount to an automatic violation of the IDEA.  *See A.C. ex rel. M.C.*, 553 F.3d at 172.  Even where a student demonstrates problematic behavioral issues, the IDEA's requirements are satisfied if the IEP provides strategies to appropriately address that behavior.  *See id.*  For example, in *A.C.*, the school district's decision not to conduct an FBA did not rise to the level of denying the student a FAPE because the student's IEP provided for an individual aide to address his behavioral issues.  *See id.*

In the present matter, while there is some evidence that G.M. displayed behavioral issues that impacted her ability to learn as well as other students in her learning environment, the record reflects that G.M.'s behavioral outbursts most often stemmed from her frustration with the difficulty of the material.  *See* Dkt. No. 15 at 22.  G.M.'s behavior became notably worse during her eighth-grade year, which numerous educators suggested is the result of her inability to understand classroom material.  *See* Dkt. No. 9 at ¶ 40.  Consistent with the SRO's finding, the Court finds that the CSE specifically took these behavioral trends into account while drafting the 2010-2011 IEP.  As discussed previously, the plan allowed G.M. to be mainstreamed in English and science – the classes where she was most interested and engaged – and recommended individual instruction in the areas where she struggled most and was most likely to display problematic behavior.

Based on the foregoing, the Court finds that Plaintiff's challenge to the 2010-2011 IEP is moot, and that, in the alternative, Defendant met its obligation to provide G.M. with a FAPE during the 2010-2011 school year.

**E.      Rehabilitation Act Claim**

Plaintiff alleges that Defendant violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by denying G.M. an inclusive program that provided the opportunity to earn Carnegie credits toward a Regents diploma.  *See* Dkt. No. 13-3 at 4.  Defendant argues that there is no evidence in the record to show that the G.M. was discriminated against based on her disability.  *See* Dkt. No. 15 at 23.  The IHO dismissed Plaintiff's Section 504 claim, finding that Plaintiff failed to demonstrate that Defendant acted in "bad faith" or exercised "gross misjudgment."  *See* Dkt. No. 10-4 at 24.

Section 504 of the Rehabilitation Act provides that "[n]o qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794.  "In order to state a claim under the Rehabilitation Act, a plaintiff must demonstrate (1) that he or she is a disabled person under the Act, (2) who has been excluded from benefits of a federally funded program or special service, (3) solely because of his or her disability."  *Alleyne v. New York State Educ. Dep't*, 691 F. Supp. 2d 322, 334 (N.D.N.Y. 2010) (citing *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990)).  In an IDEA action, in order to establish a violation of Section 504, something more than the mere denial of a FAPE must be shown.  *See id.* (citing *Wegner v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997)).  In addition to showing the denial of a FAPE, a plaintiff must also demonstrate bad faith or gross misjudgment to establish a Rehabilitation Act claim.  *See id.* (citing *Wegner*, 979 F. Supp. at 152).  "Gross misjudgment" must be more than an incorrect evaluation or a substantively faulty IEP, that is, the conduct must amount to more than "errors in professional judgment."  *Brantley v. Indep. Sch. Dist.,* 936 F. Supp. 649, 656-657 (D. Minn.

1996).

Plaintiff's Rehabilitation Act claim fails to satisfy the second and third prongs of this analysis.  The Court finds that Defendant met its obligation to provide G.M. with a FAPE for all school years in question in this action.  Additionally, Plaintiff has failed to show or even allege any bad faith or gross misjudgment on Defendant's part, and the record further establishes that G.M.'s IEPs were the product of careful and thoughtful consideration.

Based on the foregoing, the Court grants Defendant's motion as to this claim.


F.      **Compensatory Education**

Compensatory education is prospective equitable relief, which requires a school district to fund additional educational services as a remedy for any earlier deprivations in a child's education.  *See Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 109 n.2 (2d Cir. 2008) (citation omitted).  An award of compensatory services is appropriate only where a court finds a gross violation of the IDEA.  *See id*.

Plaintiff seeks reinstatement of the IHO's decision to award 360 hours of individual reading instruction provided by an expert reading specialist to compensate for the alleged deficiencies in G.M.'s reading program.  *See* Dkt. No. 13-3 at 19-20.[4]  Defendant contends that G.M. is not entitled to compensatory services for any school year at issue because the IEPs were properly implemented in 2008-2009 and 2009-2010, and in any event, Plaintiff has failed to show a gross violation of the IDEA.  *See* Dkt. No. 15 at 24.  Defendant also contends that Plaintiff

---

[4] The record does not reflect that the IHO ordered 360 hours of individual reading instruction. The IHO's order shows that he ordered "individualized, one-to-one reading for the 2011-2012 school year." *See* Dkt. No. 10-4 at 25.  The SRO found that Plaintiff raised her claim for "360 hours of compensatory reading services" for the first time in her cross-appeal.  *See* Dkt. No. 10-5 at 14.

cannot receive compensatory services for 2010-2011 because she failed to request such relief in her due process demand. *See id.* at 24-25. The SRO determined that G.M.'s IEPs were properly implemented and that Plaintiff was not entitled to compensatory services. *See* Dkt. No. 10-5 at 12.

The Court agrees with the SRO's determination that Plaintiff is not entitled to compensatory education.[5] Plaintiff has failed to show either that G.M. was excluded from any special education services to which she was entitled for an extended period of time, or that she regressed as a result of a failure to properly implement the IEPs, which is necessary to show a gross violation of the IDEA. *See Wheaton*, 916 F.2d at 74.

Since Plaintiff has failed to show a gross violation of the IDEA, the Court grants Defendant's motion as to this claim.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that Plaintiff's claims against Defendant are **DISMISSED**; and the Court

---

[5] Defendant asserts that Plaintiff failed to exhaust this claim, as she did not include a claim for compensatory education in her initial due process request. Rather, the IHO awarded compensatory education in the form of 360 hours of individual reading service after finding that the 2010-2011 IEP was inadequate. Since the Court disagrees with the IHO's decision regarding the adequacy of the 2010-2011 IEP, the Court need not address the exhaustion issue.

further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close

this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED.**

Dated: June 20, 2013
      Albany, New York

Mae A. D'Agostino
U.S. District Judge